# Special Master's Report and Recommendation

## Introduction

On April 6, 2004, Hon. Dale A. Kimball referred the above captioned

matter to a Special Master.  Judge Kimball's order of reference stated:

> The Special Master shall take evidence relevant to the boundary
> of each parcel of property in which the boundary is still in
> dispute, shall make findings as to the landowner's historic
> usage, title, and possession of each respective parcel, and issue
> a report recommending the proper boundary for each of the
> disputed parcels.

Document 451, at 2 (Order Appointing Special Master and Order of

Reference).

Under the equal footing doctrine, title to the bed of Utah Lake passed

to the State of Utah on January 4, 1896 when Utah entered statehood.  Utah

v. United States, 482 U.S. 193, 209 (1987).  The parties agree that the legal

boundary of the bed of Utah Lake is the ordinary high water mark of the lake

at statehood.  The term high water mark "means "a mark on the land

impressed by the water upon the soil by covering it for sufficient length of

time so that it is deprived of vegetation and its value for agricultural

purposes destroyed."  Provo City v. Jacobsen, 176 P.2d 130, 132 (Utah Sup.

1

Ct. 1947) (hereinafter "Jacobsen I.").  The district court has emphasized,

however, that:

> [t]here is no distinction . . . between the Jacobsen court's use of the
> term high water mark and this court's use of the term boundary.
> Neither case deals with evidence of a visible high water mark, only
> the location of the high water mark at statehood, or, in other words,
> the appropriate boundary at statehood.

Document 494, at 6 (Memorandum Decision and Order Denying

Certification to State Court, dated Sept. 14, 2004).  Absent evidence of a

visible high water mark, "other evidence as to use and possession at the time

of statehood should be examined and considered in determining the correct

boundary."  Id.

At a status conference on September 13, 2005, the parties agreed to

hold a paper trial in which they would submit briefs and evidence on the

points in issue.  See Document 569, at 2 (Order dated October 31, 2005

summarizing status conference).  Based on these submissions, the Special

Master heard oral argument on August 1, 2006.

Although the Plaintiff State of Utah argued that sufficient evidence

existed for the Special Master to set an elevation level for the entire lake,[1]

the parties for the most part focused their briefs and oral arguments on

whether Plaintiff had produced sufficient evidence to overcome a prior

---

[1] Transcript of Hearing at 41, 60-61 (August 1, 2006).

stipulation which provided, in pertinent part, that "from the time of the original federal patent Defendants and their predecessors-in-interest have continually used the land lakeward from the federally surveyed meander line to an elevation no higher than 4481 feet, except at such times as water levels have interfered with their historic use." Document 424, at 2-3 (Order dated Nov. 26, 2003).[2]

Although this stipulation relieved Defendant Landowners of the need to supply evidence to establish a prima facie case proving usage down to the 4481 level, id., at 4, the district court found that the stipulation alone did not necessarily establish such usage and, essentially invited Defendant Landowners to supply supplemental evidence. Id. However, despite the Special Master's explicit request for such evidence, Document 602, at 2 (Special Master's Notice to Parties dated July 6, 2006), Defendant Landowners supplied no evidence of their historic usage, title, and possession.[3] Instead, Defendant Landowners limited their presentation to

---

[2] The district court previously found that "[t]he 4481 stipulation merely establishes a prima facie case for the 4481 level, which case can be rebutted by the State or supplemented by the landowners." Document 424, at 4 (Order dated Nov. 26, 2003). The district court also ruled that, under the stipulation, "it is now the State's burden to put on evidence to rebut the 4481 level and show that the defendant landowners have not historically used or possessed their properties down to the 4481 level." Id. at 8.

[3] Landowners' Counsel responded to the Special Master's July 6th Notice as follows:

> Landowners' counsel understood from the prior
> conferences with the Special Master that we would proceed

contesting the sufficiency of Plaintiff's evidence rebutting the 4481

presumption.  As set forth below, however, the State of Utah has produced

overwhelming evidence that Defendant Landowners' predecessors-in-

interest did not use or possess their properties down to the 4481 level at

statehood.

## Summary of the Evidence Rebutting the 4481 Stipulation

Under the district court's interpretation, the 4481 stipulation created a

rebuttable presumption that, at statehood, Defendant Landowners'

---

> with "paper trial" on the issue of use and possession and
> whether the State could rebut the presumptions of the
> Stipulation.  Thereafter, at a later time, the parties would
> focus on the actual title issues with each parcel.  For
> landowners to assemble and submit the documentation,
> including the abstracts of title, copies of deeds, and so
> forth, showing chain of title from the original patents to the
> current owners would involve a significant amount of time
> and hundreds and perhaps thousands of documents.  While
> landowner's counsel is currently in possession of many
> such documents, they are not in a form to be submitted as
> exhibits.  Landowners have previously responded to
> interrogatories and requests for production of documents
> submitted by Plaintiff which cover somewhat summarily
> the title issue.  If the Special Master wants the Landowners
> to submit detailed documentation of each chain of title for
> each parcel from the original patent to the present time,
> counsel requests additional time to comply with the
> request.

Landowners' Supplemental Trial Brief, at 9-10.  Landowners' Counsel's understanding,
however, conflicts with Document 569, at 2 (Order dated October 31, 2005) which
summarized the parties agreement concerning the purpose of the paper trial.  See also
Transcript of Hearing, at 85. Nor would it have made any sense to bifurcate the trial to
distinguish title issues from the question of use and possession.

predecessors-in-interest used and possessed the land down to the 4481 level. Document 424, supra, at 8. Utah Rule of Evidence 301(a), which governs this presumption because the underlying issue involves state law,[4] provides that "a presumption imposes on a party against whom it is directed the burden of proving the nonexistence of the presumed fact is more probable than its existence."

To meet this burden, the State of Utah presented comprehensive evidence that persuasively rebuts this presumption. In accordance with the district court's directive that "[e]vidence from the time of statehood is the relevant evidence for determining what lands passed to the State . . . when it became a state, Document 494, supra, at 6, n.1, Plaintiff Utah produced the following evidence: (1) statehood-era water level measurements, (2) historical survey plats, (3) statehood-era photographic evidence, and (4) expert testimony from soil and plant scientists explaining the significance of the preceding evidence. Taken together, this proof established that Defendant Landowners' predecessors-in-interest at statehood did not use and possess their lands down to the elevation of 4481 feet.

---

[4] Federal Rule of Evidence 302 provides that "[i]n civil actions . . . the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law."

(1)   Statehood-Era Water Level Measurements

The Utah State Regional Engineer for Utah Lake and Jordan River maintains records, which have been kept in the ordinary course of business, documenting Utah Lake monthly water levels pre-statehood , during the statehood era, and subsequent years.  Plf's Ex. 1 ¶¶ 1-2 (Affidavit of James E. Riley).  The monthly Utah Lake water level data for water years 1884 to 1950 are also contained in an official publication of the United States Geological Survey entitled "Compilation of Records of Surface Waters of the United States through September 1950, Part 10. The Great Basin, Geological Survey Water-Supply Paper 1314," at p. 181.  Id. at ¶ 4; see also Plf's Ex. 2 (an enlarged copy of page 181 of this USGS publication showing Utah Lake monthly lake level data during statehood era through 1950).

The monthly Utah Lake level information contained in Plf's Ex. 2 includes monthly Utah Lake level data from the 1884 water year through the 1896 water year.  Plf's Ex. 1 ¶ 4.  Each water year begins October 1 and ends September 30.  Id. ¶ 3.  Thus, for example, the monthly lake level information for the 1896 water year runs from October 1895 through

September 1896, and therefore encompasses the date of statehood, January 4, 1896. Id..[5]

These monthly water level measurements show that for at least 12 water years prior to statehood, at statehood, and for several years after statehood, more than four feet of water continuously inundated the land at the 4481 level. Id. at ¶¶ 12-13; Plf's Ex. 2. In particular, the data show constant inundation at the 4481 level during the growing season, thereby precluding agricultural use during this period. Plf's Ex. 1 at ¶ 21. Indeed, even after statehood, Utah Lake only rarely receded to the 4481 level and even less frequently during growing seasons.[6]

Defendants' Landowners did not contest the relevance or competence of any of this evidence, and thus did not object to its admissibility. On the contrary, Defendant Landowners' Counsel conceded at oral argument that "there is no question, no dispute that the water levels were high for several

---

[5] Utah Lake water level elevation measurements in Plaintiff's Ex. 2 for all water years prior to and including statehood (January 4, 1896) are stated in tenths of a foot in relation to an 1885 compromise elevation of 4489.34 feet above mean sea level. Plf's Ex. 1 ¶¶ 4-6, 8-22. Thus for example, a measurement of +2.1 recorded for December, 1886 means 4489.34 plus 2.1, or 4491.44 feet above sea level. Id. at ¶ 8. The nature and origin of the 1885 compromise elevation is explained in footnote 7 infra.

[6] See, e.g., Plf's Ex. 1 at ¶ 14 (showing constant inundation at the 4481 level during the first 36 years of Utah's statehood); ¶¶ 15-18 (showing constant inundation at the 4481 level during water years 1943, 1945-1960, 1965-2002 and for the first nine months of the 2003 water year (before the Riley Affidavit was signed)); and ¶¶ 19, 20 (water covered the 4481 elevation during the entire March-September growing season for all post statehood years except 1934 (land exposed June-Sept.), 1935 (land exposed Mar-Sept.), 1936 (land exposed Mar-Apr and July-Sept.), 1940 (land exposed Aug-Sept.), 1941 (land exposed Sept.), and 1961 (land exposed Aug-Sept.).

years at or near statehood.  That's simply undisputed.  And there is no question that the landowners weren't possessing and using the land below the water levels during any of this time." Transcript of Hearing, at 65 (August 1, 2006).

In addition, the State of Utah supplied evidence that, between 1884 and 1895 Utah Lake frequently inundated the land at an elevation of 4488.84 feet (i.e., .50 feet below the 1885 compromise level of 4489.34)[7] during substantial periods of the growing season – more than seven feet higher than the 4481 stipulation level. Plf's Ex. 1, at D-10 (Ex. D.[8] to Riley Affidavit.).

---

[7] In 1885 all of Utah County (including the predecessors-in-interest to Defendant Landowners), agreed to a court-approved compromise which allowed Salt Lake County water users to inundate Utah Lakeside property with water to whatever extent necessary to dam the Lake waters at the Jordan River outlet "three feet three and one-half inches above low water mark. . . [which] is at a point four feet and six inches below the top of the stone monument near the head of Jordan River, . .  established by the Utah Lake Commission in 1885." Plf's  Ex. 7 at 9 (Salt Lake City, et al v. Joseph Colladge, et al, Case No. 3229 First District Court for the First Judicial District, Utah Territory, January 3, 1896) (referencing 1885 Utah Lake Compromise).  The 1885 compromise did not identify a specific elevation level, referring instead to "a point four feet and six inches below the top of the stone monument near the head of Jordan River. . . ." Id.  The absence of a specified elevation produced some discrepancy concerning the true elevation corresponding with the landmark used as a point of reference.  Plaintiff's evidence of water levels from 1884 to 1896 (Plf's Ex. 2, Compilation of Records of Surface Waters of the United States through September 1950) is based upon Compromise Elevation of 4489.34. Plf's Ex. 26, at 4.  Jacobsen I used a stipulated compromise elevation of 4488.95.  176 P.2d at 131.  In 1985, however, the 1885 compromise level was fixed at 4489.045 by court order in a stipulated judgment. Plf's Ex. 24 at 6 (Utah Lake Landowner's.  Association, et al v Kennecott Copper Refining Cor., et al.).  See also Transcript of Hearing at 79-81
[8] The record also refers to this item as Plf's Ex. 4 (describing extent of Utah Lake shoreline inundation  during growing seasons for water years 1884-1895/6 by year in tenth of foot elevation levels ranging from .4 feet above to 1.2 feet below 1885 compromise elevation)

Plaintiff also provided expert testimony explaining the significance of the Utah Lake water level measurements.  For example, Brigham Young University Biology Professor Jack D. Brotherson, an expert on Utah Lake aquatic and semi-aquatic vegetation, analyzed the 1884-1895 lake level information set forth in exhibits C[9] and D of the Riley Affidavit (Plf's Ex. 1).  He averred that semi-aquatic vegetation communities indigenous to Utah Lake would be found growing as high as .2 feet under the 1885 "compromise elevation" (i.e., 4489.34 - .2 = 4489.14) -- more than eight feet above the stipulated 4481 elevation -- at the end of the 1895 growing season and persisting in a dormant stage through the winter of 1895-96.  Plf's Ex. 5, at ¶ 24 (Affidavit of Jack Brotherson.)

Similarly, Utah State University Plants, Soils and Biometeorology Professor Bruce Bugbee, an expert on agricultural crop physiology, analyzed Utah Lake monthly lake level measurements for water years 1884-1895, and opined on the extent to which land adjacent to Utah Lake would have been useful for cultivation during the 12 water years prior to and including statehood.  According to Professor Bugbee, land at elevation levels of 1.2 feet below the 1885 compromise level or lower (i.e., 4489.34 − 1.2 =

---

[9] The record also refers to this item as Plf's Ex. 3 (generally describing extent of Utah Lake shoreline inundation for water years 1884-1895/6 by year in tenth of foot elevation levels).

4488.14 elevation) could not likely have been cultivated during the water years 1884 to 1888 and 1890 to 1895, Plf's Ex. 6 ¶ 16 (Affidavit of Bruce Bugbee).  Of course, land at 4481 elevation certainly could not have been cultivated during those years.  Defendant Landowners conceded that they had no reason to doubt the credibility or accuracy of the above experts. Transcript of Hearing, at 81

(2)    Historical Survey Plats.

In 1889, the United States Geological Survey ("USGS") surveyed Utah Lake and produced a map of the Lake (hereafter "1889 USGS Map") published as plate XCV in the "Eleventh Annual USGS Report to the Secretary of Interior, 1889-1890, Part II, Irrigation."  Plf's Ex. 8, at 183.

Plaintiff's Ex. 10 is an electronically scanned copy of the 1889 USGS Map which has been plotted across the Utah County Surveyor's official township and section grid.  See Plf's Ex. 9, ¶¶ 20, 21 (Affidavit of Gary Ratclife explaining USGS Map contained in Plf's Ex. 10 ).  Utah Lake 4481 elevation contour lines are superimposed over this map in Plaintiff's Ex. 10. Plf's Ex. 9 ¶ 22; Plf's Ex. 10.  These contour lines show the 4481 elevation inundated with water in 1889.  Plf's Ex. 10.

Plaintiff's Ex. 10 also shows that marshes, i.e., aquatic and semi-aquatic vegetation which constitute part of the bed of Utah Lake, fringed the water in 1889.  The Eleventh Annual USGS Report refers to "the great fringing marshes on the east and south" of the Lake, "[t]his land being, therefore, the natural flood ground of the lake."  Plf' Ex. 8, at 183.  The location and extent of the marshes fringing the Lake are apparent in Plaintiff's Ex. 10, and go well beyond the 4481 elevation lines plotted over that map.

Plaintiff's Ex. 12 is the same 1889 USGS map as Plaintiff's Ex. 10, but Exhibit 12 shows both the 4481 elevation lines <u>and</u> the adjusted 1985 compromise elevation lines.  Plf's Ex. 11 ¶ 4 and Ex. B thereto.  Plaintiff's Ex. 12 shows that, in 1889, the marshes of the lake extended well beyond the (1985 adjusted) compromise elevation of 4489.045 feet.[10]

(3)    <u>Photographic Evidence</u>

The Archives Department of the Church of Jesus Christ of Latter-day Saints contains two 1903 photographs taken by Utah historical photographer George Edward Anderson (and presented by the Plaintiff in CD format). The two photographs bear the inscription "Indian War Veterans Aug. 14, 1903

---

[10] This adjusted 1985 compromise elevation is discussed in footnote 7.

Provo Lake Resort." Plf's Ex. 13 ¶¶ 4-6 and Ex. A thereto (Affidavit of W. Randall Dixon); Plf's Ex. 15 ¶¶ 4-5 and Ex. B thereto (Supplemental Affidavit of W. Randall Dixon).  Two reproductions of these photographs are contained in Plf's Exs. 14 and 16. The two photographs show a gathering of people at the Utah Lake shoreline near the Provo River inlet.  Plf's Ex. 17 ¶ 3 (Supplemental Affidavit of Jack Brotherson.).  The photographs also portray a line of semi-aquatic vegetation along the lake shore, namely hardstem bulrush, which is a marsh plant native to Utah Lake (thriving in the lake bed).  Plf's Ex. 17 ¶ 4.

Professor Brotherson drew a red line to identify the highest extent of the bulrush colony depicted in one of the 1903 photos and to indicate the vegetative high water mark in this section of Utah Lake as it existed on August 14, 1903.  Plf's Ex. 17 ¶ 5 and Ex. A thereto; Plf's Ex. 18.  Professor Brotherson concluded, based on the water level data for Utah Lake on August 1st and September 1st 1903 (see Plf's Ex. 2 and Plf's Ex. 17 ¶ 7), that the elevation of the lake was -3.89 feet below the 1885 compromise elevation on the date these photos were taken (August 14, 1903). Plf's Ex. 17 ¶ 8.  This means the lake elevation on that date was 4485.45 (i.e., 4489.34 - 3.89 = 4485.45).   A common sense view of the photographs suggests that the land rises several feet from the water's edge to the line on

the photo placed by Brotherson.  Indeed, Kent Brown, an expert photogrammetrist who studied both photographs and analyzed their three-dimensional effect as a stereo pair, concluded that is not unreasonable that the land next to the water could rise as high as four feet from the water's edge to the top of the bulrush colony depicted in Plaintiff's Ex. 18.  Plf's Ex. 19 ¶¶ 8-11 (Affidavit of Kent D. Brown).

That would place the high water mark shown in the photographs at or very near the 1885 compromise elevation of 4489.34 (4485.45 + 4.0=4489.45).  Professor Brotherson opined that the 1903 photos revealed a conservative indication of the elevation of the vegetative high water mark at statehood, because the overall water levels of the lake trended downward from the date of statehood (January 4, 1896) to the date of the photos (August 14, 1903).  Plf's Ex. 17 ¶ 9

(4)    Additional Considerations Rebutting the 4481 Presumption

In addition to the evidence set forth above, the record suggests that even the low water mark during the Statehood-Era was well above 4481. For example, late nineteenth century and early twentieth century territorial and state court findings and decrees repeatedly memorialize an "already-established low water mark of the Lake" at an elevation three feet three and

one half inches below "compromise elevation" (4489.34).  See, e.g., Plf's

Ex. 7 at pages 6, 9, 10-14, 16.  This established low water mark (calculated

to be 4486.05) is at least five feet more than the stipulated 4481 high water

mark.  Id; see also Provo City v. Jacobsen, 181 P.2d, 213, 214 (Utah Sup.

Ct.1947) (hereinafter "Jacobsen II") (noting that "[a]ccording to the charts of

the water levels of Utah Lake prior to statehood, 4484 feet above sea level is

about as low as the water ever went during that time . . .") (emphasis added).


### Defendant Landowners' Arguments

In response to the above evidence, Defendant Landowners offer

essentially three arguments to support their claim that the State of Utah has

failed to rebut the 4481 presumption.  First, they contend that the State has

simply "repackaged evidence . . . that the Jacobsen court rejected.  The

Jacobsen court said that high water levels for a period of years at or near

statehood didn't prove anything."  Transcript of Hearing, at 64.  Second,

although they concede that at least four feet of water continuously covered

the land at 4481 elevation from 1885 to statehood, id., at 66-67, Defendant

Landowners contend that long term inundation does not render the land

useless for agricultural purposes.  Third, defendants maintain that the State's

evidence offered to rebut the 4481 presumption fails to account for artificial

increases in elevation due to damming of the Jordan River. <u>Defendant Landowner's Trial Brief and Reply to Plaintiff's and Intervenors' Opening Trial Briefs</u>, dated March 3, 2006, at 8-10. None of these arguments undermines the strength of the State's evidence rebutting the 4481 presumption.

The <u>Jacobsen</u> Courts' factual findings, of course, do not bind this present litigation, but the State of Utah's evidence in any event is not merely repackaged material. Nor did <u>Jacobsen I</u> suggest "that high water levels for a period of years at or near statehood didn't prove anything." <u>Transcript of Hearing</u>, at 64. Rather, <u>Jacobsen I</u> merely observed that "the high water mark is not determined by an <u>average</u> over a period of years of the highest levels which the water reached each year." 176 P.<u>2d</u>. at 132 (emphasis added). Unlike <u>Jacobsen</u>, however, the State of Utah did not attempt to prove the <u>high water mark</u> by averaging the highest water levels during the years prior to statehood. Instead the State proved that <u>use and possession did not occur at the 4481 level</u> by introducing monthly water levels during 12 years preceding statehood. This proof vividly established that the 4481

level was constantly covered with at least four feet of water during the pre-

statehood period. Plf's Ex. 1 ¶¶ 12-13, Plf's Ex. 2.[11]

This evidence – especially when combined with Plaintiff's plat and

photographic evidence -- establishes that defendants' predecessors-in-

interest did not use and possess land at the 4481 elevation at the time of

statehood.  Under Judge Kimball's analysis, agricultural use and possession

serve as a proxy for evidence of the ordinary high water mark to determine

the boundary at statehood. Document 494 at 6; Document 424 at 11;

Document 451 at 2.  Accordingly, the absence of agricultural use and

possession at the 4481 level establishes that the boundary of Utah Lake at

statehood was at a higher level.

Defendant Landowners' argument that land retains its agricultural

value despite long periods of inundation is also unpersuasive.  In support of

this claim, Defendants offered only one affidavit, that of John H. Hinckley.

Mr. Hinckley averred that, in his experience, he found land especially fertile

after water had receded following lengthy periods of inundation.  Such

anecdotal evidence, unsupported by scientific proof and not necessarily

applicable to all lands at issue in this litigation, is simply insufficient to

---

[11] In addition, as indicated above, the State also proved widespread inundation at the
4481 elevation for many years immediately following Utah's admission to statehood.
See footnotes 5-6 and accompanying text supra.

undermine the vast amount of evidence Plaintiff introduced to rebut the 4481 presumption. Moreover, this argument is especially unavailing given Defendant Landowners' position that land retains its agricultural value regardless of how long it has been inundated. Transcript of Hearing, at 67-68. If accepted, this argument would nullify the Court's use and possession test.

Finally, Defendant Landowners' contention that Plaintiff's rebuttal evidence fails to account for artificial increases in elevation is also unavailing. Defendants cite the Jacobsen I trial court for the proposition that Utah Lake water levels were artificially raised by dams placed from 1884 to 1896 and "[t]hat an artificial water level cannot determine the boundary between the property owned by the State of Utah and the property owned by the defendants." Defendant Landowners' Trial Brief and Reply to Plaintiff's and Intervenors' Opening Trial Briefs, at 8; Exhibit C (Findings of Fact and Conclusions of Law, November 26, 1943, Civil No. 12117, Fourth District Court, Utah County (Findings), ¶ 45, p. 19.) However, on appeal, the Jacobsen decisions did not even mention the artificial influence issue as relevant to determining the ordinary high water mark or boundary. This issue was only addressed by the Jacobsen I dissent, which noted the diversion of "great quantities of water from the streams feeding Utah Lake,

17

which diversions would tend to substantially lower the lake levels probably

to a much greater extent than the Jordan dam could possibly raise the water."

176 P.2d at 143.  Moreover, from a policy standpoint, the statehood use and

possession test would be rendered meaningless by attempts to factor in the

effect of all disturbances to the water levels regardless of whether they stem

from man-made dams, diversions, dredging, or natural variations in

precipitation and evaporation.  The critical question is only whether

defendants' predecessors-in-interest used and possessed the land at a certain

level at statehood under the lake-wide circumstances that existed during the

statehood era.

Furthermore, Defendant Landowners also lack standing to make this

artificial influence argument, absent proof that their predecessors-in-interest

acquired their federal patents before a dam was built in 1872. (Counsel for

Plaintiffs and Defendants acknowledge the existence of an 1872 dam but

differ on its impact.  Transcript of Hearing, at 71-72). Similarly, those

defendants whose predecessors-in-interest acquired their federal patents

between 1872 and 1885, are bound by the 1885 agreement, entered into

between Utah Lakefront property owners and Salt Lake City users of the

Jordan River, which, in effect, set a compromise elevation of 4489.34.  Utah

Lakefront property owners would not likely have agreed to this elevation if

18

it would have produced widespread flooding of lands they used for agricultural purposes.  The 1885 landowners having agreed to this arguably artificially induced elevation, their successors-in-interest lack grounds to contest the State's right to the lakebed at that level in 1896.

Finally, even if Defendant Landowners could overcome this obstacle, they failed to present any evidence of the extent to which the Jordan River dam artificially increased the water level of Utah Lake. <u>Transcript of Hearing</u>, at 74.  Accordingly, this issue provides no basis for finding that Plaintiff has failed to rebut the 4481 presumption.


### Completion of the Trial

Having rebutted the 4481 presumption, the State of Utah urged the Special Master to set a lake-wide elevation establishing the boundary of Utah Lake at the 4489.14 elevation level. <u>Transcript of Hearing</u>, at 91.  At oral argument, I declined to do so because I wanted to ensure that Defendant Landowners had an opportunity to present their evidence of statehood use and possession.  I took this position despite Defendant Landowners' failure to supply evidence in response to my notice calling for them to produce their evidence of statehood use and possession.

In a post-trial supplemental brief, Plaintiff argued forcefully that Defendant Landowners were obliged to proffer such evidence at trial and that their opportunity to present their evidence has expired. Plaintiff presents persuasive arguments in support of this position, maintaining that Defendant Landowners' response to discovery interrogatories establishes that they have no evidence of statehood agricultural use and possession. Plaintiff's Post Trial Supplemental Brief, at 17 (citing defendants' answers to Interrogatory 8). Indeed, Defendant Landowner's Counsel conceded that he had not gathered such evidence as of August 1, 2006, and that landowners were 'rely[ing] upon the Stipulation for use and possession." Defendant Landowners' Brief In Conformance to Special Master's Request for Additional Briefing, July 21, 2006 at 9-10. As Plaintiff has overcome the 4481 stipulation, this position is no longer tenable.

Nevertheless, although the record contains no evidence supporting Defendant Landowners' claims, after five years of litigation Defendant Landowners should have a final opportunity to present their case. Defendant Landowners, however, must first show that they have something to present. Therefore, rather than proceed directly to the next phase of the trial involving each of the parcels still at issue, Defendant Landowners should be required to produce evidence constituting prima facie proof of statehood

title, use and possession. In effect, this permits Defendant Landowners to go to trial if they can produce sufficient evidence to withstand summary judgment.   If Defendants can produce such evidence, the Special Master will conduct a trial to resolve the boundary of each remaining parcel. Absent such evidence, the Special Master will conduct a hearing to determine a lake-wide elevation at statehood, and project the effect of such elevation in a separate proceeding for each parcel.

Michael Goldsmith
Special Master

November 11, 2006