IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **STATE OF UTAH, by and through it DIVISION OF FORESTRY, FIRE AND STATE LANDS,**<br><br>        **Plaintiff,**<br><br>vs.<br><br>**UNITED STATES OF AMERICA; DEPARTMENT OF THE INTERIOR; BUREAU OF RECLAMATION; ELUID MARTINEZ, in his official capacity as Commissioner; BUREAU OF LAND MANAGEMENT; SALLY WISELY, in her capacity as Utah State Director, BLM; RICHARD W. DAVIS; JOHN DOE and MARY DOE; et al.,**<br><br>        **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:97CV927DAK<br><br>Judge Dale A. Kimball |

      This matter is before the court on the determination of a lake-wide boundary elevation for Utah Lake (referred to as "Phase 1"). The parties have submitted evidence and fully briefed the issue. On December 12, 2012, the court held oral arguments on the Phase 1 issue. At the hearing, the State of Utah was represented by Michael S. Johnson, the Landowner Defendants were represented by Robert C. Fillerup, and the Intervenors were represented by Jorro Walker. The court took the matter under advisement and agreed to issue its order after the parties had time to complete additional settlements. The court has allowed that time to expire. After carefully considering the evidence submitted, the arguments advanced by the parties, and the law

and facts relevant to the issue, the court issues the following Memorandum Decision and Order.

## BACKGROUND

After making several legal rulings in this matter, United States District Court Judge Dale A. Kimball referred the case to Special Master Michael Goldsmith pursuant to Rule 53(a) (1)(B) of the Federal Rules of Civil Procedure. The court's Order of Reference tasked the Special Master with taking evidence relevant to the boundary of each parcel of property in which the boundary is still in dispute, making findings as to the historic usage, title, and possession of each parcel, and issuing a report recommending the proper boundary for each of the parcels.

The parties had a trial in this matter before Special Master Michael Goldsmith on August 1, 2006. At the trial, the State presented substantial evidence of monthly lake level data, expert scientific analysis of the water levels' effects on soils and plant growth, historical plats, and photographs. The Special Master found the State's evidence "comprehensive" and "overwhelming." The Landowner Defendants, however, supplied no evidence of their historic usage, title, and possession. To allow the Landowner Defendants another opportunity to submit relevant evidence, Special Master Goldsmith laid out a two-phase procedure for addressing the issues in this case: Phase 1 involves the determination of a lake-wide boundary elevation based on evidence submitted by the parties; and Phase 2 involves projecting that lake-wide boundary onto each remaining parcel in dispute. The court approved and adopted the Special Master's First Report & Recommendation.

After the Special Master's First Report & Recommendation, the Landowner Defendants submitted evidence of use and possession dating back to the 1930s. The State's evidence providing water levels over the decades demonstrated that the lake levels were lowest in the

1930s, 1960s, and 1990s. Thus, testimony regarding the water levels in the 1930s would be uncharacteristically low. In his Second Report & Recommendation, Special Master Goldsmith rejected the Landowners' evidence because it was too remote in time from statehood. The Special Master gave the Landowners another opportunity to submit evidence during briefing on Phase 1. The court approved and adopted the Special Master's Second Report & Recommendation.

The parties submitted their evidence for the Phase 1 determination of a lake-wide boundary to Special Master Goldsmith. However, he was unable to make his ruling on the Phase 1 boundary before his death. This court held a status conference on January 21, 2010, at which the parties asked the court to delay ruling on Phase 1 while they attempted to settle as many parcels as possible. The parties have engaged in extensive settlement efforts for the past three years.

## DISCUSSION

Based on the court's prior rulings, the parties agree that the controlling boundary test in this case was established in the Utah Supreme Court's *Jacobsen* decisions. *See Provo City v. Jacobsen*, 176 P.2d 130 (Utah 1947); *Provo City v. Jacobsen*, 181 P.2d 213 (Utah 1947); *Provo City v. Jacobsen*, 217 P.2d 577 (Utah 1950). This test looks to evidence of statehood-era use and possession to ascertain the location of the statehood vegetative high water mark, below which valuable agricultural plants cease to grow. *Jacobsen III*, 217 P.2d at 578. *Jacobsen* explained that the vegetative line/boundary is a mark impressed upon the soil over several years based on the frequency and duration of inundation and its effects on the soil. *Jacobsen*, 176 P.2d at 133; *Jacobsen III*, 217 P.2d at 578.

To meet the *Jacobsen* test, Special Master Goldsmith afforded the Landowner Defendants another opportunity to submit evidence during briefing on Phase 1, but they did not. The State continues to rely on the evidence it presented at the initial trial to meet the *Jacobsen* test. The State submits that its evidence, even when conservatively read, demonstrates that the ground suitable for agricultural cultivation extended no lower than .2 feet below Compromise Elevation at statehood.

This court has recognized that the State's evidence, which identifies statehood-era water levels and analyzes their effects upon soils in light of plant water needs and tolerances, is consistent with and is the kind of evidence called for under the controlling *Jacobsen* boundary test. The State's evidence that the boundary be set at a level of .2 feet below the Compromise Elevation is based upon a conservative reading of the evidence in the record. The evidence in the record could support a boundary setting at a higher elevation. The State's experts indicate that the statehood boundary was located somewhere between .2 feet below Compromise and .4 feet above Compromise. For simplicity's sake, this calculation does not include orthometric corrections, which the experts believe would have pushed the estimates higher. Moreover, although the State believes the evidence supports a finding that the Compromise Elevation is located at 4489.34 feet above sea level, it has agreed to use a lower level, 4488.95, for the Compromise Elevation.

The minus .2 feet below Compromise level lies below the 1885 Compromise Elevation, which was not tied to any specific elevation above sea level, and, in many locations around the lake, below the meander line as well. The meander line is not an elevation specific line, and for a few Landowner Defendants, the meander line is located lower than .2 feet below Compromise.

The meander line is a metes and bounds surveyed line that does not follow the contour or elevation of the lake bed.  The State submits that it has never sought land above the meander line regardless of elevation.  The State, therefore, urges that the statehood boundary be set at the *lower* of .2 feet below Compromise Elevation or the meander line, which benefits the Landowners.

The Landowners have previously disagreed with the idea of using statehood era lake levels to set the boundary.  Nevertheless, the Landowners state that the evidence submitted by the State, coupled with the 4481 Stipulation, sets the boundary at statehood no higher than 2.4 feet below Compromise Elevation.  The Landowner Defendants argue that if statehood era water levels are going to be used, they should have the benefit of the lowest elevation of the water's edge for those years.  In the 4481 Stipulation, the parties agreed that the landowners used the land "to the water's edge."  The lowest monthly water level during the statehood era was in November 1895 at 2.4 feet below compromise.  Thus, the Landowner Defendants contend that this is the level where the boundary should be set.

However, picking the lowest monthly water level is not in accordance with the *Jacobsen* test.  The *Jacobsen* test focuses on averages over several years, not the lowest monthly reading.  In addition, the fact that the Landowners used to the water's edge is helpful in determining usage, but it is not determinative of a boundary when the evidence demonstrates significant monthly fluctuations of lake levels.  The State's experts provide persuasive testimony regarding usage in relation to the water fluctuations.

As a quiet title plaintiff, the State has the burden to prove the claimed boundary by a preponderance of the evidence.  The State has produced substantial evidence from the statehood

era which fits the analytical framework set out in the *Jacobsen* decisions and this court's prior orders. This evidence stands unchallenged and unimpeached. Because the Landowner Defendants have not produced evidence of statehood-era use and possession, the boundary is must properly be based on the State's evidence. The court concludes that the State has met its burden. Therefore, the court agrees with setting the boundary at the State's requested level.

## CONCLUSION

Based on the above reasoning, the court sets the lake-wide boundary at the *lower* of (1) .2 feet below Compromise Elevation of 4488.95 or (2) the Meander Line. This boundary shall be applied to all parcels that have not already agreed to a boundary through settlement.

Dated this 15th day of March, 2013.

BY THE COURT:

_____
DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE